# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHWESTERN DIVISION

| | |
|---|---|
| BRENDA F. MCBETH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 08-CV-05097-NKL |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## ORDER

Plaintiff Brenda McBeth ("McBeth") challenges the Social Security Commissioner's ("Commissioner") denial of her claim of disability and disability insurance benefits. This lawsuit involves an application for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433.

McBeth's initial application was denied, and she appealed the denial to an administrative law judge ("ALJ"). After an administrative hearing, the ALJ found that McBeth was not "disabled" as that term is defined in the Act. The Appeals Council denied McBeth's request for review, rendering the ALJ's decision the final decision of the Commissioner. The Act provides for judicial review of a final decision of the Commissioner. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

The Court remands the matter to the ALJ for further proceedings in accordance with this Order.

1

**I.     Factual Background**

The complete facts and arguments are presented in the parties' briefs and will be duplicated here only to the extent necessary.[1] At the time of the hearing, McBeth was a fifty-four-year-old high school graduate with two years of vocational technology study in institutional food service. McBeth worked as a cook, sewing-machine operator, sandwich maker, cake decorator, inventory clerk, and bartender in the years preceding her alleged disability. McBeth alleged she became disabled on or about February 1, 2004, but worked part-time through May 2004.

McBeth claims she became disabled and unable to work because of emphysema, spine problems, eczema, arthritis, fibromyalgia, vertigo, irritable bowel syndrome, and other impairments. In support of these claims, McBeth submitted medical records from multiple doctors.

On May 25, 2005, McBeth was seen by Dr. Ahmed T.M. Robbie for a neurological consultation with dizziness, nausea and motion sickness. She reported that her symptoms had gotten worse over the past few years which had interfered with her driving. Dr. Robbie diagnosed moderate to severe vestibular neuritis and positional vertigo which had interfered with McBeth's quality of life. On June 22, 2005, McBeth presented for a follow-up appointment regarding her continued dizziness. She also reported that she had pain when she sat for long periods or when she walked around. Dr. Robbie diagnosed vestibular neuritis

---

[1] Portions of the parties' briefs are adopted without quotation designated.

with positional vertigo, stating that it seemed stable. He also diagnosed back pain with leg numbness, likely related to degenerative joint disease and nerve pain.

On August 11, 2005, McBeth presented for a consultive evaluation with Dr. Waqar Waheed at the request of the Missouri Division of Family Services. Dr. Waheed did not review any of McBeth's medical records. Dr. Waheed stated that McBeth had multiple medical problems, including right arm and leg pain and paresthesias, the sensation of tingling, pricking or numbness of the skin. With regard to McBeth's complaint of right upper and lower extremity pain, Dr Waheed explained that McBeth's symptoms might indicate she had a slipped disk in her spine or nerve disorders. Dr. Waheed also explained that McBeth may have a diagnosis of fibromyalgia or her symptoms could be explained on the basis of arthritis. McBeth had minimal difficulty with ambulation, but Dr. Waheed observed she had a diffuse spine tenderness.

Upon his examination, Dr. Waheed also determined that McBeth had right shoulder tenderness with decreased range of motion, normal neck and right elbow, wrist and hip range motion, and no weakness that would interfere with fine motor skills. He found that McBeth exhibited minimal difficulty with walking and he did not perceive any deficits that would limit McBeth's ability to perform different types of work, including sitting, standing, walking, hearing or speaking.

On August 30, 2005, McBeth presented to Dr. Robbie with pain and tenderness all over her body. She reported that her pain had been going on for a long time and that she had numbness and heaviness in her right arm and leg. McBeth also reported that her dizziness

3

had improved, which Dr. Robbie noted was likely due to positional vertigo. McBeth was diagnosed with tenderness all over her body with numbness likely related to fibromyalgia, with increased heaviness on her right side accompanied by tenderness and numbness.

On October 4, 2005, McBeth presented for a follow-up appointment regarding her fatigue and tenderness in her arms and back pain. Dr. Robbie stated that McBeth likely had fibromyalgia and that there was no evidence of any neurological damages or neurological condition. On October 4, 2005, Dr. Robbie completed a form titled "Fibromyalgia Active Tender Points" related to McBeth's claim in which he stated that McBeth met fifteen domains in active fibromyalgia. On October 10, 2005, McBeth presented with aching pain, fatigue, weakness and headaches. Dr. Robbie noted that he sent for her blood work and diagnosed fibromyalgia and the possibility of connective tissue disease.

McBeth was referred by Dr. Robbie to Dr. Abu-Libdes, a rheumatologist. On October 25, 2005, McBeth presented with aches and pains in her joints and in her upper and lower extremities as well as her muscles, especially in her elbows, shoulders and legs. McBeth presented with swelling in her legs and joints. She also had difficulty sleeping even though she was taking sleep medication. After examination, Dr. Abu-Libdes documented osteoarthritic changes in both thumbs as well as both of her feet. Trigger points were noted in her elbow, shoulders, in between her shoulder blades, lower back, and lateral aspects of her hips were consistent with fibromyalgia syndrome. Dr. Abu-Libdes diagnosed fibromyalgia.

On November 1, 2006, McBeth presented to Dr. Robbie with shoulder and neck pain.

She reported that she continued to have dizziness as well as ringing in her ears and was having problems sleeping. Dr. Robbie documented signs and symptoms consistent with cervicogenic pain, headaches, insomnia and back pain. On February 6, 2007, McBeth presented with constant headaches and neck pain, which were ongoing. Dr. Robbie diagnosed tension and rebound headaches and neck pain.

McBeth also submitted medical records from her treating physician Dr. Iftikhar Ali dated August 27, 2004 to February 21, 2007. Between these dates McBeth presented twenty-five times for her medical problems, and multiple tests were ordered on these visits. On a number of Dr. Ali's records, the word "myalgias" is circled in a list of symptoms. The parties agree that Dr. Ali's handwritten notes are illegible.

Dr. Ali did submit two Medical Source Opinion of Residual Functional Capacity forms on September 26, 2005 and February 12, 2007. On September 26, 2005, Dr. Ali assessed McBeth's physical capacity as follows: infrequently sit, stand/walk; frequently lift/carry less than three pounds; never use the right arm and occasionally use the left arm for reaching, pushing and pulling; never use the right hand for grasping, handling, fingering or feeling; occasionally use the left hand and infrequently use the left hand for grasping, handling, fingering or feeling; capable of performing zero hours of heaving, medium, light, and sedentary work; must avoid dust, gasses of fumes, pollen, smoke, strong odors or sprays, chemicals, and high humidity (hard to breathe). Dr. Ali also marked that McBeth's emotional anxiety requires a low stress job. Handwritten notes also explain that McBeth had chronic back and leg pain and weakness and pain in the right arm.

5

On February 12, 2007, Dr. Ali assessed McBeth's physical capacity as follows: infrequently sit, infrequently stand/walk limited to 10-15 minutes; frequently lift/carry less than ten pounds; occasionally reach, push and pull with right arm; frequently reach, push and pull with left arm; never use right arm to grasp, handle, finger or feel; occasionally use left arm to grasp, handle, finger or feel. He concluded that McBeth needs to rest because of her pain and fatigue and it is medically necessary for her to frequently elevate both of her legs at waist level. McBeth's asthma is triggered by allergens and she should avoid dust, gases or fumes, pollen, smoke, strong odors and sprays, chemicals, high humidity (due to her emphysema). McBeth's emotional anxiety needs a low stress job. Dr. Ali further opined that Ms. McBeth met twelve domains in active fibromyalgia tender points.

### A. McBeth's Testimony

On February 27, 2007, McBeth testified before the ALJ. McBeth testified that the reason she could no longer work was due to her severe pain all over her body, eczema, and pain in her hands. McBeth testified that she continued to suffer with eczema on her fingers, feet and hands. McBeth testified that she was diagnosed with fibromyalgia in 2004 but had severe pain long before she was formally diagnosed. She also testified that Dr. Ali had diagnosed her with arthritis.

McBeth testified that her typical day consisted of getting up in the morning, making some tea, taking her medications, and then lying on the couch for an hour and a half. She testified that she would eat a bowl of cereal, get dressed, and return to lying on the couch and watching television or sometimes reading a newspaper or a book. She testified that she could

6

Case 3:08-cv-05097-NKL   Document 14   Filed 11/13/09   Page 6 of 15

only walk about forty to forty-five feet before she became out of breath and would have to sit down and rest her legs and back. She testified that she could only stand unsupported for three to four minutes before having to sit down and rest. She testified that she could only climb two to three stairs. She testified that her husband built a ramp with railing going up to her front door at home so she would be able to slowly go up and down the ramp. McBeth testified that she could only sit in a chair for ten to fifteen minutes because her legs would go numb and her back would become very painful. McBeth testified that because of all of her impairments she was not able to do any work.

### B. The Vocational Expert's Testimony

The ALJ heard testimony from a vocational expert ("VE"). The ALJ asked the VE if he should find that McBeth has a variety of impairments including back and leg pain and pain in the other parts of the body, and considering those impairments in combination he should find that McBeth has enough residual functional capacity for light work, would McBeth be able to return to any of her past jobs.

The VE testified that, within these parameters, McBeth could perform work including bartender, the inventory clerk, cake decorator, sewing machine operator, and night auditor. The ALJ then asked the VE whether McBeth's eczema would prevent her from doing any of those jobs. The VE testified that if McBeth's hands are splitting open due to her eczema, then it would not be appropriate for her to do jobs related to food or grease and that a sewing machine operator would require dexterity to maneuver fabric. Thus, the VE testified that McBeth could be an inventory clerk or a night auditor.

7

The ALJ then asked the VE whether McBeth's vestibular dysfunction and dizziness would impede her ability to work. The VE testified that it would not impact the night auditor because it is a sedentary position.

On cross-examination, counsel for McBeth asked whether, given the restrictions on Dr. Ali's Medical Source Opinion of Residual Functional Capacity dated September 26, 2005, McBeth could perform any of her past relevant work or any other work. The VE testified that she could not work. The VE also testified that McBeth could not work given the restrictions in Dr. Ali's Medical Source Opinion of Residual Function Capacity dated February 12, 2007. Further, the ALJ clarified, asking the VE if he should find that everything Dr. Ali said in the report is true and correct, would McBeth be able to work. The VE testified that she could not.

## II. The ALJ's Decision

ALJs evaluate disability claims through a five-step process:

> The claimant must show he is not engaging in substantial gainful activity and that he has a severe impairment. Those are steps one and two. Consideration must then be given, at step three, to whether the claimant meets or equals [an impairment listed in the regulations]. Step four concerns whether the claimant can perform his past relevant work; if not, at step five, the ALJ determines whether jobs the claimant can perform exist in significant numbers.

*Combs v. Astrue*, 243 Fed. Appx. 200, 202 (8th Cir. 2007) (citing SSR 86-8, 20 C.F.R. §§ 404.1520, 416.920).

After describing this process, the ALJ found that McBeth was not disabled. At step one, he determined that McBeth was not engaging in substantial gainful activity since

February 1, 2004.

At step two, the ALJ determined McBeth was severely impaired by osteoarthritis and dermatitis. The ALJ found several other alleged impairments to be non-severe. With regard to positional vertigo, the ALJ stated that Dr. Robbie reported this was stable on her medication. With regard to her headaches, the ALJ found that they had improved over time and a CT of the brain was normal. With regard to emphysema, he found that a pulmonary function test on September 2004 showed a mild ventilatory defect, a September 2005 chest x-ray showed normal pulmonary vessels, and a July 2006 chest x-ray revealed clear lungs. With regard to irritable bowel syndrome, he noted that McBeth reported in December 2006 that the constipation and diarrhea were not much of a problem. He noted that her flank pain was improved with medication. The ALJ mentioned her history of eczema of the hands. At this second step, the ALJ did not mention McBeth's fibromyalgia diagnosis. With regard to all of these impairments, the ALJ concluded that McBeth had not had consistent treatment for these impairments and that the evidence did not demonstrate that these impairments would cause significant limitation in her ability to work.

At step three, the ALJ determined that McBeth did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments.

At step four, the ALJ found that McBeth has the residual functional capacity to perform a full range of light work. The ALJ noted McBeth's complaints of eczema in the hands, elbow and feet and the pain in her right upper and lower extremities. He also noted her testimony that she could walk only forty to forty-five feet and stand three to four minutes

9

before her back began to hurt and that the eczema caused her difficulty writing and holding onto objects.

While stating that McBeth's medically determinable impairments could cause these symptoms, the ALJ found that McBeth's statements concerning intensity, persistence and limiting effects of those symptoms were not entirely credible.

The ALJ also commented on the medical opinions of record. The ALJ said the medical evidence of record does not support a finding for disabling limitations due to the consulting examination of Dr. Waheed in August 2005, giving his determination substantial weight. The ALJ noted that Dr. Robbie diagnosed fibromyalgia but that there were no further records until October 2006 when Dr. Robbie diagnosed her with cervicogenic pain.

The ALJ recognized the two Medical Source Opinions completed by Dr. Ali, but gave them little weight, claiming they were inconsistent with the objective evidence in the record, including Dr. Ali's own records. The ALJ noted that the record contains "only one legible record by Dr. Ali and that record indicates that the claimant's pain has improved."

Commenting on McBeth's credibility, the ALJ noted that despite the onset of her alleged disability in February 2004, McBeth had minimal treatment records prior to 2005 and that she had poor follow up with her treating neurologist.

At the fifth step, the ALJ considered the testimony of the VE. He stated that the VE testified that a person of McBeth's age, education, past work experience, and residual functional capacity would be able to perform work as a night auditor, sewing machine operator, cake decorator, inventory clerk, and bartender. Therefore, the ALJ found that

McBeth was not disabled.

## III. Standard of Review

In reviewing a denial of disability benefits, this Court considers whether the ALJ's decision is supported by substantial evidence on the record as a whole. *See Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir.2007). "Substantial evidence is evidence that a reasonable mind would find adequate to support the ALJ's conclusion." *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir.2007). "On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied." *Strom v. Astrue*, No. 07-150, 2009 WL 583690, at *22 (8th Cir. Mar. 3, 2008) (citation omitted). The Court will uphold the denial of benefits so long as the ALJ's decision falls within the available "zone of choices." *See Casey v. Astrue*, No. 06-3841, 2007 WL 2873647, at * 1 (8th Cir. Oct. 4, 2007). "An ALJ's decision is not outside the 'zone of choice' simply because [the Court] might have reached a different conclusion had [it] been the initial finder of fact." *Id.* (quoting *Nicola*, 480 F.3d at 886).

It is well-established that the ALJ carries the duty of fully and fairly developing the record. *See Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000) (citation omitted). This is true even where a claimant is represented by counsel. *Id.*

## IV. Discussion

McBeth argues that the ALJ erred by (1) failing to afford the appropriate weight to McBeth's treating physician, Dr. Ali; (2) failing to find McBeth's various ailments, including

11

fibromyalgia "severe"; (3) failing to properly assess McBeth's physical residual functional capacity; (4) failing to perform a function-by-function evaluation of McBeth's exertional and non-exertional activities; and (5) failing to find McBeth's testimony credible. Because the Court finds that the ALJ failed to re-contact McBeth's treating physician, Dr. Ali, for additional evidence or clarification regarding his illegible treatment notes, the Court remands for the ALJ to give proper consideration to her treating physician.

The ALJ failed to fully and fairly develop the record with regard to McBeth's treating physician, Dr. Ali. An ALJ is not required by the regulations to recontact a treating physician whose opinion was "contradictory or unreliable." *Hacker v. Barnhart*, 459 F.3d 934, 938 (8th Cir. 2006) (citing 20 C.F.R. § 404.1512(e)). However, a duty to recontact a medical source is triggered when there is insufficient evidence to make an informed determination. *See, e.g.*, *Pearson v. Barnhart*, No. 04-300, 2005 WL 1397049, at *4 (E.D. Tex. May 23, 2005). Under the regulations, "[t]he ALJ is required to recontact medical sources . . . only if the available evidence does not provide an adequate basis for determining the merits of the disability claim." *Sultan v. Barnhart*, 368 F.3d 857, 863 (8th Cir. 2004) (citing 20 C.F.R. §§ 416.912(e), 416.919a(b)). The ALJ is not required "to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005) (quoting *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir.2004)).

The Court finds the ALJ failed to develop the record regarding a crucial issue: McBeth's fibromyalgia diagnosis. The ALJ gave Dr. Ali's opinions little weight,

12

commenting that Dr. Ali's opinion was "inconsistent with the objective evidence of record including his own records." Yet, the ALJ recognized that only one of Dr. Ali's treatment records was legible, though McBeth presented twenty-five different times between 2004 and 2007. In spite of this finding, the ALJ did not re-contact McBeth's physician as required by the regulations. *See, e.g.*, *Bowman v. Barnhart*, 310 F.3d 1080, 1085 (8th Cir. 2002) (holding that the ALJ was obligated, pursuant to 20 C.F.R. § 404.1512(e), to contact the claimant's treating physician for "additional evidence or clarification" where a treating physician's entries were cursory). Rather, the ALJ relied upon the findings of a one-time consulting examination done by Dr. Waheed in 2005 just prior to McBeth's fibromyalgia diagnosis. Indeed, Dr. Waheed indicated upon his examination that McBeth may have a diagnosis of fibromyalgia.

The ALJ discounted McBeth's fibromyalgia diagnosis by commenting that McBeth had poor follow-up with her treating neurologist, Dr. Robbie. During that time in which treatment notes are allegedly lacking according to the ALJ's analysis, McBeth was being seen by Dr. Ali. Moreover, it was Dr. Ali who sent McBeth to Dr. Robbie for consultation. It is reasonable for McBeth to follow up with her treating physician after her diagnosis. However, the extent of Dr. Ali's treatment and recommendations are absent because his notes are illegible and the ALJ did not contact him to clarify. Without sufficient evidence to make an informed decision, the ALJ could not properly analyze McBeth's claim. As a result, the ALJ's entire analysis in his opinion from step two on is flawed and must be reconsidered after re-contacting Dr. Ali regarding his opinions.

Moreover, the ALJ's determination of McBeth's residual functional capacity is also hampered by his failure to fully develop the record. The only physician to give a medical opinion on McBeth's residual functional capacity was Dr. Ali in both 2005 and 2007. Dr. Ali's opinion sets out significant limitations for McBeth, as set forth above. With regard to her fibromyalgia, in 2005, Dr. Robbie noted fifteen fibromyalgia active tender points and in 2007, Dr. Ali noted twelve. Indeed, the VE testified that if the ALJ were to find everything in those forms true, McBeth could not work. It is true that in 2005, Dr. Waheed commented that he did not "appreciate any deficits that would limit patient's ability for performing different works, i.e. sitting, standing, walking, hearing, or speaking" but he did not articulate any specific limitations. Dr. Waheed's statement alone is insufficient to determine McBeth's residual functional capacity, particularly in light of her treating physician's statements in 2005 and 2007. Without a fully developed record of Dr. Ali's treatment records, the ALJ was not free to discount his opinions, particularly given that the record contains evidence of McBeth's fibromyalgia diagnosis from three physicians, Dr. Ali, Dr. Robbie, and Dr. Abu-Libdes.

**V.    Conclusion**

The ALJ did not properly consider the medical evidence and failed to fully develop the record. Accordingly, it is hereby

ORDERED that Plaintiff Brenda McBeth's Complaint [Doc. # 13] is GRANTED. The ALJ's decision is REVERSED and REMANDED for further proceedings consistent with this Order.

14

                                                      s/ Nanette K. Laughrey
                                                      NANETTE K. LAUGHREY
                                                      United States District Judge

Dated: November 13, 2009
Jefferson City, Missouri